# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 15 |
| | ) |
| ESSAR STEEL ALGOMA INC., *et al.*,[1] | ) Case No. 14-[___] ([___]) |
| | ) |
| Debtors in a foreign proceeding | ) (Joint Administration Requested) |
| | ) |

## DECLARATION OF J. ROBERT SANDOVAL IN SUPPORT OF (I) VERIFIED CHAPTER 15 PETITIONS; (II) FOREIGN REPRESENTATIVE'S MOTION FOR ORDERS GRANTING PROVISIONAL AND FINAL RELIEF IN AID OF FOREIGN PROCEEDING; AND (III) CERTAIN RELATED RELIEF

Pursuant to 28 U.S.C. § 1746, I, J. Robert Sandoval, hereby submit this declaration (the "Declaration") under penalty of perjury:

1.      I am the General Counsel of Essar Steel Algoma Inc. ("Algoma"), the authorized foreign representative (the "Foreign Representative") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" and, together with the Debtors' non-Debtor affiliates, the "Company") in a proceeding (the "Canadian Proceeding") commenced under section 192 of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, as amended (the "CBCA"), and pending before the  Ontario Superior Court of Justice, Commercial List (the "Canadian Court").

2.      On July 16, 2014, the Canadian Court entered the interim order, a certified copy of which is attached hereto as **Exhibit A** (the "Preliminary CBCA Order"), which, among other things, appointed Algoma as the "foreign representative" of the Debtors.

---

[1]    The Debtors in the foreign proceeding, along with the last four digits of the United States Tax Identification Number, Canadian Business Number or Netherlands Chamber of Commerce Number, as applicable, of each of the Debtors, are: Algoma Holdings B.V. (1679); Cannelton Iron Ore Company (9965); Essar Steel Algoma Inc. (0642); Essar Steel Algoma Inc. USA (8788); Essar Canada Inc. (8779).  The location of the Debtors' corporate headquarters and the service address for all of the Debtors is:  105 West Street, Sault Ste. Marie, Ontario P6A 7B4, Canada.

3.      I submit this Declaration in support of the following motions and other documents submitted by the Foreign Representative (collectively, the "First Day Pleadings"):   (a) the verified chapter 15 petitions of the Debtors; (b) the *Foreign Representative's Motion for Orders Granting Provisional and Final Relief in Aid of Foreign Proceeding* (the "Recognition and Relief Motion"); (c) the *Foreign Representative's Motion for an Order Directing the Joint Administration of the Debtors' Chapter 15 Cases* (the "Joint Administration Motion"); (d) the *Foreign Representative's Motion for an Order Authorizing the Filing of a Consolidated List of Foreign Proceeding Administrators, Litigation Parties, and Entities Against Whom Provisional Relief is Sought* (the "Consolidated Lists Motion"); and (e) the *Foreign Representative's Motion for an Order Scheduling Hearing and Specifying the Form and Manner of Service of Notice* (the "Notice Procedures Motion").  I am authorized by the Debtors to submit this Declaration on their behalf in support of the First Day Pleadings.

4.      In my role as General Counsel of Algoma, I have become familiar with the Debtors' businesses, day-to-day operations, and financial affairs, and I have been closely involved in the Debtors' refinancing and restructuring efforts to date.  I am an individual over the age of 18 and, if called upon, could and would testify to the facts set forth in this Declaration. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals, learned from my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' industry, operations, and financial condition.

### Background

## I.      Introduction to the Debtors and the Company

5.      Algoma Holdings, B.V. ("Holdings") is a company registered under Dutch law, Algoma is an Ontario corporation, Essar Steel Canada Inc. ("Essar Canada") is a Canada

Corporation, and the other two Debtors, Essar Steel Algoma, Inc., USA ("ESAI USA") and Cannelton Iron Ore Company ("Cannelton"), are Delaware corporations.

6.      The Company operates one of Canada's largest integrated steel manufacturing facilities.  The Company's headquarters and manufacturing facilities are in Sault Ste. Marie, Ontario, Canada.

7.      The Company was founded in 1901 by an American industrialist, Francis H. Clergue, and has a history of leadership in the industry.  The Company began by casting liquid steel into ingots and rolled into rails for railroad expansion across Canada.  The Company then grew into an integrated steel mill and, in 1959, was one of the first steelworks in North America to commission a basic oxygen furnace.  In 1995, the Company invested $450 million into the construction of its direct strip production complex, the world's first continuous casting complex. Today, the Company is a fully integrated steel producer, with a diverse customer base throughout Canada and the United States.

8.      The Company's steelworks operations and head office are located at its 2,000-acre site located in the hub of the Great Lakes region in Sault Ste. Marie, Ontario, Canada.  It has sales offices in Burlington, Ontario, and Calgary, Alberta in Canada and a small sales team in the United States.  The Company employs approximately 3,000 employees, including eight in the United States, and approximately 95% of its Canadian employees are represented by the United Steelworkers of America.

## II.      Overview of the Company's Business

9.      The Company is Canada's second largest integrated steel producer in Canada by capacity and by finished product shipments for the 2013 calendar year.  For the twelve months ended March 31, 2014, the Company shipped approximately 2.4 million tons of steel products, which, together with non-steel sales, generated net sales of $1.7 billion and Adjusted EBITDA of

$168 million.  Approximately 60% of the Company's customers are located within a 500-mile radius in the key steel consuming regions of the U.S. Midwest, U.S. Northeast, and southern Ontario, allowing the Company to service customers at competitive costs.

### A.     Steel Production

10.     The Company is an integrated steelmaker — the Company produces coke from coal, uses the coke to power furnaces which convert iron ore pellets to iron, converts the iron to liquid steel, and produces a broad range of high-quality semi-finished and finished products from the liquid steel.  The Company's production facilities include:

- three coke batteries;

- two blast furnaces;

- basic oxygen steelmaking and refining facility;

- conventional slab caster;

- direct strip production complex;

- conventional combination hot rolling mill capable of switching between plate and sheet products;

- plate heat treat facilities and plate finishing facilities; and

- downstream facilities consisting of pickling, cold rolling, annealing and tempering, sheet slitting, cut to length, and blanking facilities.

**Steelmaking Process**



### B.    Steel Products

11.    The Company's rolling mills provide the flexibility to optimize product mix between sheet and plate products to meet changes in market demand and pricing.  The Company sells a majority of its products to steel service centers who distribute to the automotive, construction, and heavy equipment markets.  In addition, the Company markets and sells its products directly to customers in the automotive sector, the pipe and tube sector, the fabrication sector, and the manufacturing sector.  The Company's customers are primarily in Canada (52% of shipments) and the United States (46% of shipments).



**2014 Shipments by End Market**



12.     The Company produces sheet steel in a wide variety of widths and gauges of hot-rolled coil, cold-rolled coil, hot-rolled pickled and oiled products, floor plate, and cut-to-length product.  The primary end-users of sheet steel are the automotive industry, hollow structural product manufacturers, and the light manufacturing and transportation industries.  For the last five years, sheet steel products have represented approximately 85% of total steel shipment volumes.

13.     The Company produces plate steel in various grades of as-rolled, hot-rolled, and heat-treated plate.  The primary end-user of plate steel is the fabrication industry, which uses plate steel in the construction or manufacture of railcars, buildings, bridges, off-highway equipment, storage tanks, ships, armored products for military applications, large diameter pipelines and wind energy generation equipment.  For the last five years, plate steel products have represented approximately 15% of total steel shipment volumes.

### C.     Raw Materials and Energy

14.     The Company's steelworks requires large quantities of several different raw materials for operation including, among others, iron ore pellets, coal, coke, limestone, alloys, and scrap.  The largest input in the steel making process is iron ore, all of which is purchased under a contract (the "Cliffs Iron Ore Contract") from The Cleveland-Cliffs Iron Company, Cliffs Mining Company, and Northshore Mining Company (collectively, "Cliffs").  In January 2014, ESAI signed a 10-year agreement with Essar Steel Minnesota LLC, an affiliate, to supplement the iron ore provided by Cliffs beginning in January 2017.

15.     The Company purchases two-thirds of its coal requirement from New Trinity Coal Inc., an affiliate, and the balance from independent suppliers.  The Company's internal coke batteries produce the majority of its coke requirements for the blast furnace, and additional coke is purchased as required on the spot market.  The Company purchases limestone, alloys, and

other raw materials at competitive prices.  The Company generates half of its scrap requirements internally and purchases the balance from regional sources.

16.     The Company's manufacturing operations run around the clock, and consume significant amounts of energy.  The Company purchases all of its natural gas from independent suppliers at market pricing, and currently do not have any fixed price contracts in place.  The Company obtains electricity from the Independent Market Operator in Ontario at regulated spot prices.  Finally, the Company's oxygen supply is provided by Praxair Canada Inc., a third party supplier.

**III.     The Company's Corporate and Capital Structure**

17.     In 2007, the Company was acquired (such acquisition, the "Acquisition") by Essar Global Fund Limited ("EGFL"), a multinational company with majority ownership in a number of world-class assets diversified across the energy, metals and mining, infrastructure, and services sectors.  EGFL and its subsidiaries have made significant investments in the Company, including an initial equity investment of $530 million as part of the Acquisition. Through the Company and EGFL's other subsidiaries, EGFL has approximately 14 million tons of annual steel production capacity with operations in India, North America, and Southeast Asia. As a portfolio company of EGFL, the Company benefits from access to a global sales network, a structured knowledge sharing program, and collaboration with EGFL affiliates to improve margins.

18.     As of the date hereof (the "Petition Date"), the Debtors have outstanding funded debt for borrowed money in the aggregate principal amount of approximately $1.2 billion.  The Debtors' capital structure is illustrated below (all amounts in $ millions):

| Outstanding Debt | Principal Amount | Interest Rate | Maturity |
|---|---|---|---|
| ABL Facility | 343.9 | L+800 | Sep. 20, 2014 |
| Secured Notes | 400.0 | 9.375% | Mar. 15, 2015 |
| Avenue Loan | 26.4 | 9.375% | Mar. 15, 2015 |
| Transferred Secured Loan | 30.9 | 3.500% PIK | Dec. 20, 2014 |
| *Total Secured Debt* | *802.0* | | |
| Unsecured Notes | 384.7 | 9.875% | Jun. 15, 2015 |
| Shareholder Loan | 30.6 | 5.500% PIK | Jun. 15, 2015 |
| ***Total Debt*** | ***1,216.5*** | | |

## A.    ABL Facility

19.    On September 20, 2012, Algoma, as borrower, and Holdings and Cannelton, as guarantors, entered into that certain Credit Agreement, as amended, supplemented, or modified from time to time (the "ABL Credit Agreement"), with Deutsche Bank Trust Company Americas as administrative and collateral agent (the "ABL Agent") and the lenders from time to time party thereto.  The ABL Credit Agreement provides for an asset-based term loan facility (the "ABL Facility") maturing on September 20, 2014.

20.    As of the Petition Date, the principal amount outstanding under the ABL Facility is approximately $343.9 million.  Borrowings under the ABL Facility bear interest at the LIBOR rate (subject to a floor of 1.5%) plus 8%, and are governed by a conventional asset-based loan borrowing base, comprised of advances on cash, accounts receivable, and inventory.  Any shortfall in the borrowing base will trigger a mandatory loan repayment in the amount of the shortfall, subject to certain cure rights including the deposit of cash into an account controlled by the ABL Agent.  All obligations under the ABL Facility are secured by working capital assets comprised of highly liquid cash, accounts receivable and inventory, and related proceeds, and are also secured on a junior basis by, among other assets, the plants, property, and equipment of Algoma.  The ABL Facility and consequently, the Debtors' and ABL lenders' respective rights, are governed by New York law.  See ABL Credit Agreement, Section 12.08.

B.      **Secured Notes**

21.     As of the Petition Date, Algoma had $400 million principal amount outstanding of its Secured Notes due March 15, 2015 (the "Secured Notes") issued pursuant to that certain Indenture, dated as of December 14, 2009, among Algoma as issuer, Cannelton as guarantor, and Wilmington Trust Company as trustee, as amended, supplemented, or modified from time to time (the "Secured Notes Indenture").  Algoma has the option to redeem the existing Secured Notes, in whole or in part, at any time at a stipulated redemption price.  The Secured Notes bear interest at the rate of 9.375% per annum payable on March 15 and September 15 of each year. The Secured Notes are fully and unconditionally guaranteed, jointly and severally, on a senior unsecured basis by Holdings and on a senior secured basis (subject to the first priority security interests granted in respect of the ABL Facility on certain assets, including working capital assets) by Cannelton.  The Secured Notes and the Cannelton guarantee are secured by a first priority lien on plants, property, and equipment of Algoma.  The Secured Notes rank *pari passu* in right of payment with existing and future senior obligations and are senior in right of payment to all existing and future subordinated indebtedness.    The Senior Notes Indenture and consequently, the respective rights of the Debtors and the holders of Secured Notes, are governed by New York law.  See Secured Notes Indenture, Section 13.06.

C.      **Avenue Loan**

22.     On December 6, 2013, Algoma, as borrower, and Holdings and Cannelton, as guarantors, entered into that certain Credit Agreement, as amended, supplemented, or modified from time to time (the "Avenue Credit Agreement"), with Avenue Capital Management II, L.P. as documentation agent and the lenders from time to time party thereto.  The Avenue Credit Agreement provides for a term loan (the "Avenue Loan") of $25 million maturing on March 15, 2015.  The Avenue Loan bears interest at a rate of 9.375% per annum payable on the last

business day of September and March, and, until March 14, 2014, additional PIK interest accrued and was capitalized daily at a rate of 15.625% per year (with a maximum cap).   The Avenue Loan secured on a *pari passu* basis with the Secured Notes.

### D.    Transferred Secured Loan

23.    Algoma received a junior secured loan (the "Permitted Junior Secured Shareholder Loan") from its shareholder, Essar Steel Limited, a Mauritius company (the "Sponsor"), in the maximum principal amount of $30 million.   The Permitted Junior Shareholder Loan accrues payment-in-kind interest at a rate of 3.5% per annum, and is secured by substantially all of Algoma's right, title and interest in its personal property and owned real property subject to the terms of a junior intercreditor agreement.   On April 30, 2014, with the consent of the ABL Agent, Algoma transferred the Permitted Junior Secured Shareholder Loan to an unaffiliated third party (such transferred loan, the "Transferred Secured Loan").

### E.    Unsecured Notes

24.    As of the Petition Date, Algoma had approximately $384.7 million principal amount outstanding of its 9.875% senior unsecured notes due June 20, 2015 (the "Unsecured Notes") issued pursuant to that certain Indenture, dated as of June 20, 2007, among Algoma as issuer, Cannelton as guarantor, and Wilmington Trust Company as trustee, as amended, supplemented, or modified from time to time (the "Unsecured Notes Indenture").   The Unsecured Notes due 2015 bear interest at the rate of 9.875% per annum payable on December 15 and June 15 of each year.   The Unsecured Notes are senior unsecured obligations and rank *pari passu* in right of payment with the Debtors' existing and future senior obligations and are senior in right of payment to all existing and future subordinated indebtedness.   The Unsecured Notes are effectively subordinated to all of Algoma's secured obligations, to the extent of the value of the assets securing such indebtedness.   The Unsecured Notes are guaranteed on a senior

unsecured basis by Cannelton.  The Unsecured Notes Indenture and consequently, the respective rights of the Debtors and the holders of Unsecured Notes, are governed by New York law.  See Unsecured Notes Indenture, Section 12.08.

### F.    Shareholder Loan

25.    As a condition to the ABL Agent's consent to the transfer of the Permitted Junior Secured Shareholder Loan, Essar Steel Algoma Inc. invested approximately $30 million into Holdings, and Holdings invested such amount into Algoma in the form of an unsecured shareholder loan permitted under the ABL Credit Agreement (the "Shareholder Loan").  The Shareholder Loan accrues payment-in-kind interest at a rate of 5.5% per annum and is not guaranteed.

### IV.    The Company's Recent Difficulties

26.    A combination of the economic downturn, severe weather disruptions, unfavorable raw material pricing, and increased near-term cost of pension liabilities have contributed to the Company's financial underperformance over the past few years.

### A.    Economic Downturn

27.    Steel construction in North America is highly correlated to the macroeconomic level of the broader economy and growth in the construction and manufacturing sectors.  North American steel production reached a low in 2009 at 91 million tons, as did pricing for steel products, at $370/ton for hot rolled coil and $540/ton for medium plate.  As a result, the Company recorded net losses of $396 million and $305 million for fiscal years 2010 and 2011, respectively, with EBITDA of $50 million and -$10 million, respectively.  Since 2009, conditions in the North American market improved, with production reaching 131 million tons in 2013, and pricing reaching $687/ton for hot rolled coil and $813/ton for medium plate in May 2014.

B.        **Severe Weather Disruptions**

28.       Even though macroeconomic conditions have trended favorably since the economic downturn of 2009, the Company's operations and financial performance suffered this past year due to the unprecedented and extreme cold of the winter season.  Almost 95% of Lake Superior was frozen over the winter, and thick ice remained on the lake through May.  These conditions caused delays in shipments of iron ore, a key raw material input, to the Company.  As a result, the Company's steelmaking operations could not produce at full capacity to take advantage of the rebounding steel demand and pricing over the past year.

C.        **Unfavorable Raw Material Pricing**

29.       As described above, the largest input in the Company's steelmaking process is iron ore, which the Company purchases solely from Cliffs.  The Cliffs Iron Ore Contract was initially negotiated when Algoma emerged from a restructuring in 2002.  The Cliffs Iron Ore Contract granted Cliffs an exclusive iron ore supply contract through 2016 and contained above-market pricing for iron ore.  The Company paid $143/ton (and purchased 3.2 million tons) of iron ore on average in 2013 compared with Cliffs' published price of $113/ton over that same period.  This above-market pricing significantly increased the Company's operating costs, resulting in a negative impact to the Company's financial results.  The Company's EBITDA in fiscal year 2013 was $23/ton, compared to an estimated $97/ton that it would have earned if it had paid market prices for iron ore — a difference of $64/ton, or approximately $160 million in aggregate.

30.       In 2013, the Company renegotiated the Cliffs Iron Ore Contract to fully address the issues related to market price dynamics and to extend the supply agreement with Cliffs up to 2024.  The renegotiated terms of the Cliffs Iron Ore Contract took effect beginning in January 2014, and the Company expects that the resolution of the above-market iron ore pricing will

meaningfully improve financial results.  Additionally, the Company entered into a contract with Essar Steel Minnesota Limited ("ESML"), an affiliate, which will commence on January 1, 2017 and provide 2.5 million tons of iron ore per annum.  This contract with ESML will provide competition to Cliffs and help to secure optimal pricing for iron ore going forward.

### D.    Increased Near-Term Cost of Pension Liabilities

31.    In December 2013, the Government of Ontario passed a regulation establishing a fixed payment schedule ("Pension Payment Schedule") for the Company to restructure its underfunded defined benefit pension plans.  The Pension Payment Schedule requires the Company to pay $55 million in the calendar years 2014 and 2015 (*i.e.*, $4.6 million monthly), $60 million in the calendar year 2016 (*i.e.*, $5.0 million monthly), and $5.0 million monthly during calendar year 2017 ending with the month in which the valuation report for its pension plans is filed.  While the Pension Payment Schedule is a significant near-term cost through 2017, it allows the Company to take advantage of the rising interest rate environment[2] which, combined with the increased funding provided for under the Pension Payment Schedule, should reduce the Company's pension funding deficit going forward.

## V.    ESAI's Need to Restructure and Efforts to Date

32.    Despite the expected improvement in economic conditions, more competitive pricing for iron ore, and improved future outlook for its pension liabilities, the Company faces an immediate need to restructure its debt obligations.  The Company's annual interest expense on its debt obligations is approximately $113 million, and its annual interest expense on pensions is approximately $30 million, for a total annual interest expense of approximately $140 million. The Company expects a negative EBITDA through the calendar year 2014, with the above

---

[2]    For example, a 1% increase in interest rates would reduce the Company's pension liabilities by approximately $140 million.

improvements only beginning to take effect in 2015. Even then, the Company's earnings before interest and tax would cover its interest expense with little room to spare — EBIT is expected to be approximately $179 million in 2015, and approximately $200 million thereafter. The Company's current level of debt obligations of over $1.2 billion and annual interest expense of $113 million are unsustainable. Furthermore, the Company will need to achieve a significant deleveraging in order to refinance the ABL Facility by September 20, 2014.

33.     Beginning in March 2014, the Company retained restructuring advisors, including Stikeman Elliott LLP as Canadian legal counsel, Kirkland & Ellis LLP as United States legal counsel, and Blackstone Advisory Group as investment banker and financial advisor to advise the Company on its refinancing options and a potential restructuring. Following a comprehensive analysis of the Debtors' finances and operations, the Company and its advisors determined that the Debtors could not continue to service their existing unsecured debt, and concluded that the Company would have to significantly reduce its unsecured debt in addition to refinancing its secured debt prior to September 20, 2014.

34.     The Company commenced a comprehensive due diligence process for the refinancing of the ABL Facility, the Secured Notes, and other secured debt (the "Secured Debt Refinancing"). The Company signed engagement letters with three banks to conduct diligence and provide term sheets for the Secured Debt Refinancing. On June 28, 2014, Goldman Sachs provided the Company with a draft term sheet and commitment letter (the "GS Commitment") for the Secured Debt Refinancing. The GS Commitment is contingent on a significant reduction of the Company's debt, specifically the Unsecured Notes, an equity contribution from EGFL, and the contribution of Trinity Coal Corporation ("Trinity").

35.     Concurrently with the refinancing due diligence process, the Company formulated a restructuring proposal with its restructuring advisors that would achieve a discount on the Unsecured Notes and provide for an investment by EGFL.  The Company, together with its advisors, engaged in discussions with an ad hoc group of holders of over 70% of Unsecured Notes (the "Unsecured Noteholder Committee")[3] and their advisors in late May to negotiate the terms of a consensual restructuring.    The Unsecured Noteholder Committee executed confidentiality agreements in order to participate in these negotiations.

36.     The Company also engaged with advisors to an ad hoc group of holders of over 50% of Secured Notes (the "Secured Noteholder Group").  The Secured Noteholder Group presented Algoma with proposals for both a restructuring of Algoma and debtor-in-possession ("DIP") financing for a proceeding under Canada's *Companies' Creditors Arrangement Act* (the "CCAA").  Algoma did not consider the restructuring proposal to be achievable because it would require a cram down of the Unsecured Notes, which is not permissible under the CCAA.  By late June, the Secured Noteholder Group indicated that the DIP proposal was no longer actionable.

37.     The Company's restructuring efforts came to a key decision point in the weeks leading up to June 15, 2014, the date when an approximately $19 million interest payment was due under the Unsecured Notes Indenture (the "Interest Payment").  On June 15, the Company elected to utilize the 30-day grace period for the Interest Payment provided for under the Unsecured Notes Indenture.  Since electing to use the grace period, the Company has been actively managing its public relations to maintain customer, vendor, and employee support for its refinancing and restructuring efforts.  The Company's trade vendors have not yet taken action to

---

[3]    The Unsecured Noteholder Committee also holds over one-third of the Secured Notes.

meaningfully constrain liquidity.  Following June 15, the Company continued discussions with the Unsecured Noteholder Committee and its advisors regarding a consensual restructuring.

38.     After weeks of arm's-length, good faith discussions with the Unsecured Noteholder Committee, the principal terms of a consensual restructuring arrangement were agreed to with respect to a CBCA plan of arrangement (the "CBCA Plan"), the principal terms of which are reflected in the term sheet (the "Term Sheet") attached hereto as **Exhibit B**.  The Parties continue to negotiate the terms of the restructuring support agreement (the "RSA") and EGFL's equity commitment in connection with the restructuring and will finalize those agreements in the near term, at which point the Debtors will update the Court.[4]  The Term Sheet sets forth, among other things, the framework of the Debtors' expected CBCA plan of arrangement.  The salient terms of the Term Sheet include:

- a substantial deleveraging of the Company's balance sheet;

- a secured refinancing of the ABL Facility, the Secured Term Loan Credit Facility, and the Secured Notes;

- a cash payment to holders of Unsecured Notes, and an exchange of new notes for the Unsecured Notes; and

- a total equity infusion from EGFL of up to $300 million, and potentially a contribution from EGFL of 100% of the equity of New Trinity Coal Inc.

39.     Importantly, the Term Sheet provides for a substantial pre-closing equity infusion from EGFL of $100 million of which $25 million is to be funded not later than five (5) days after the execution of the RSA.  The remainder of EGFL's equity commitment is to be funded from time to time during the pendency of the Canadian Proceeding and the Recognition Proceeding.

---

[4]     A copy of the board resolutions authorizing, among other things, entry into the RSA, commencement of the Canadian Proceeding and the Recognition Proceeding, and appointment of Algoma as the Foreign representative, is attached hereto as **Exhibit C**.

40.    The Debtors commenced the Canadian Proceeding to effect the consensual restructuring reflected in the Term Sheet.  The CBCA provides for a controlled reorganization procedure designed to enable financially distressed companies to avoid foreclosure or seizure of assets while maximizing the company's value as a going concern for the benefit of creditors and other parties in interest, and includes provisions for the adjustment of debt (*i.e.*, "arrangements") under which companies may effect reorganizations.  The Canadian Proceeding involves an arrangement which restructures the claims and interests of the Debtors' secured lenders, secured and unsecured noteholders, and equity holders.  Like certain "prepackaged" bankruptcy cases in the U.S., the claims of all other creditors, including employees, litigants, trade vendors, licensors and other contract counterparties, and others, are unaffected by the recapitalization transaction. Accordingly, the Company will continue to pay such other creditors in the ordinary course.

41.    Pursuant to the CBCA, on July 16, 2014, the Canadian Court entered the Preliminary CBCA Order.  The Preliminary CBCA Order (a) provides for a stay of proceedings against the Debtors; (b) provides certain protection for the Debtors' secured creditors; (c) appoints Algoma as foreign representative of the Debtors; and (d) authorizes the Debtors to apply to the Canadian Court for an order (i) specifying such items as the manner for calling and holding a special meeting of the stakeholders (*e.g.*, distribution of proxy materials, notice periods, and time and place of meeting), the persons entitled to vote at the meeting, classes of persons entitled to a separate class vote, and the acceptance thresholds for approval of the CBCA Plan and/or (ii) seeking an extension of the stay.  A true and correct copy of the Preliminary CBCA Order is attached hereto as **Exhibit A**.

42.    As detailed in the Ciardullo Declaration, in the Canadian Proceeding, the Debtors' assets and affairs are subject to the supervision of the Canadian Court during the pendency of the

Canadian Proceeding.  Any party-in-interest seeking to object to the arrangement may appeal to the Canadian Court.  The Canadian Court, through the Canadian Proceeding, is properly exercising its jurisdiction over the Debtors, as provided under section 192 of the CBCA. Pursuant to the CBCA, the Debtors have obtained from the Canadian Court the Preliminary CBCA Order, in which the Canadian Court grants a stay for the protection of all of the Debtors and their assets.  Preliminary CBCA Order at ¶ 2.  In addition, the Preliminary CBCA Order grants certain protection for the Debtors' secured creditors.  Preliminary CBCA Order at ¶ 3.

43.     Subsequently, on the date hereof, the Foreign Representative commenced these chapter 15 cases by filing, among other things, verified chapter 15 petitions seeking recognition by the Court of the Canadian Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code.  While it is anticipated that the Canadian Proceeding will be the primary Court-supervised restructuring of the Debtors, the Debtors require a recognition order under chapter 15 of the Bankruptcy Code to ensure that they are protected from creditor actions in the United States (including with respect to the ABL Facility, the Secured Notes, and the Avenue Loan) and to assist with the implementation of a CBCA plan of arrangement or any other transaction to be completed pursuant to the Canadian Proceeding.

**Requests for Recognition and Related Relief**[5]

44.     In connection with the filing of these chapter 15 cases, the Debtors have submitted the Recognition and Relief Motion, the Joint Administration Motion, the Consolidated Lists Motion, and the Notice Procedures Motion.  In addition to the facts set forth above, factual bases for relief under each of these motions is set forth below.  I believe, after consultation with counsel, that the relief requested by each of the motions is necessary to maximize value for all of

---

[5]     Capitalized terms used but not otherwise defined in this section have the meanings ascribed to them in the relevant First Day Pleadings.

the Debtors' creditors through the Canadian Proceeding, protect the Debtors' assets in the U.S., and properly administer these proceedings.

## I.        Recognition and Relief Motion

45.     Contemporaneously herewith, the Foreign Representative filed the Recognition and Relief Motion seeking (a) entry of a Provisional Order (i) recognizing and enforcing the Preliminary CBCA Order, (ii) applying sections 362 and 365 of the Bankruptcy Code in these chapter 15 cases on an interim basis pursuant to sections 1519(a)(3), 1521(a)(7), and 105(a) of the Bankruptcy Code, and (iii) granting such other and further relief as the Court deems just and proper; and (b) entry of the Final Order (i) granting the petitions in these cases and recognizing the Canadian Proceeding as a foreign main proceeding pursuant to section 1517 of the Bankruptcy Code, (ii) giving full force and effect in the United States to the Preliminary CBCA Order, including any extensions or amendments thereof authorized by the Canadian Court and extending the protections of the Provisional Order to the Debtors on a final basis, and (iii) granting such other and further relief as the Court deems just and proper.

46.     As detailed more fully in the Memorandum of Law filed in support of the Recognition and Relief Motion, I believe that there is a compelling case for recognition of the Canadian Proceeding as a foreign main proceeding.  I have been advised by counsel that the Canadian Proceeding is a "foreign proceeding" and that Algoma is a "foreign representative," as those terms are defined in the Bankruptcy Code.  I have been further advised that these cases were duly and properly commenced by filing the Petitions for Recognition accompanied by all fees, documents, and information required by the Bankruptcy Code and the Bankruptcy Rules, including:  (a) corporate ownership statements; (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtors, (ii) all parties to litigation pending in the United States in which the Debtors are a party at the time of

the filing of the Petitions for Recognition, and (iii) all entities against whom provisional relief is being sought; (c) a statement identifying all foreign proceedings with respect to the Debtors that are known to the Foreign Representative; and (d) a certified copy of the Preliminary CBCA Order.

47.     Counsel has also advised me that the automatic stay is one of the most fundamental protections provided by the Bankruptcy Code.  I have been advised that it halts all collection efforts, harassment, and foreclosure actions against debtors and provides them with necessary breathing room to step back from and attempt to resolve the financial pressures that caused their bankruptcy filing.  Here, the immediate imposition of the automatic stay pursuant to the Provisional Order is necessary.

48.     As noted above and in the Memorandum of Law, Holdings and Cannelton are guarantors of the Senior Secured Notes and the Avenue Loan , and Cannelton is a guarantor of the Unsecured Notes, and each also has assets in the United States and/or stock of the principal Debtor, Algoma.  U.S. Debtor ESAI USA also has assets in the United States.  Such assets include office leases (the "U.S. Leases") in Chicago, IL, New York, NY, and Minneapolis, MN.  In addition, ESAI USA holds two separate bank accounts (the "U.S. Bank Accounts") at Bank of America—one in Richmond, VA and the other, in Atlanta, GA, which, as of June 30, 2014 hold $14,965.01 and $41,869.78, respectively.  Furthermore, each of the Debtors' credit instruments (the "Credit Instruments" and together with the U.S. Leases and U.S. Bank Accounts, the "U.S. Assets") is governed by U.S. law and each of the lenders thereto is located in the U.S.  The Debtors' and lenders' respective rights are governed by U.S. Law.  Of course, the Debtors' contractual rights are property of the Debtor.  Unless the Provisional Order is entered, the Debtors face the possibility of immediate and irreparable harm from potential actions being

brought against Holdings and/or Cannelton in the United States seeking to enforce their guarantees of the Secured Notes, the Avenue Loan, and/or the Unsecured Notes or to recover in respect of the U.S. Assets.  This type of decentralized administration of the Debtors' assets could be extremely prejudicial to the Debtors' reorganization process, and could serve to hinder the Canadian Proceeding.

49.     In contrast, I believe that the Debtors' creditors and other stakeholders will suffer little, if any, harm as a result of the requested provisional relief as such relief will merely preserve the status quo and enable the Debtors to continue to finance their operations during the short time necessary for the Court to rule on the Petitions for Recognition.  In fact, I believe that granting the request for provisional relief will benefit the Debtors' creditors and stakeholders because it will ensure that the value of the Debtors' assets and business are preserved and maximized for the benefit of all stakeholders.

50.     The Debtors will provide certain adequate protection to the holders of Secured Notes, lenders under the ABL Facility, and Avenue Capital in consideration for the Debtors' use of assets during the pendency of the Canadian Proceeding and these chapter 15 cases.  Such adequate protection will be in the form of:

  a.  payment of actual, reasonable and documented fees and expenses of (x) White & Case LLP and Osler, Hoskin & Harcourt LLP, each in connection with serving as legal counsel to Deutsche Bank Trust Company Americas, as administrative agent for the ABL Facility, and (y) Pillsbury Winthrop Shaw Pittman LLP in connection with serving as legal counsel to Wilmington Trust Company, as trustee for the Secured Notes Indenture, in each case of (x) and (y) whether incurred before or after the Petition Date in connection with the Canadian Proceeding and these chapter 15 cases;

  b.  unless otherwise agreed, compliance with the "Borrowing Base" (as such term is defined in the ABL Credit Agreement);

  c.  delivery of the Budget as defined in the Term Sheet to Deutsche Bank Trust Company Americas, as administrative agent for the ABL Facility,

and Wilmington Trust Company, as trustee for the Secured Notes Indenture and collateral agent under the Avenue Credit Agreement; provided that Deutsche Bank Trust Company Americas and Wilmington Trust Company may deliver such Budget to the lenders under the ABL Facility, on the one hand, and the Avenue Credit Agreement and the holders under the Secured Notes Indenture, on the other hand, so long as such lenders and holders have executed a non-disclosure agreement satisfactory to the Debtors; and

d.  payment of any unpaid interest accrued and owed under the ABL Facility, the Secured Notes Indenture, and the Avenue Credit Agreement during the post-petition period as and when due under the applicable credit documents; provided that such interest shall accrue and be owed at the non-default rate set forth in such credit documents.

The Foreign Representative submits that there will be little, if any, harm to creditors if the Foreign Representative's request for provisional relief is granted; indeed, harm will come to the Debtors' creditors if the provisional relief is not granted.

51.    In addition, counterparties to various contracts with the Debtors may take the position that such contracts terminated upon the commencement of the CBCA Proceedings and, without the protections afforded by section 365(e) of the Bankruptcy Code, the Debtors may lose valuable rights and benefits thereunder. Accordingly, I submit that the relief requested in the Recognition and Relief Motion is therefore necessary to protect against the disruption to business operations and interference with reorganization efforts that would result from such exercise of remedies by contract counterparties and others. Absent this relief, the Debtors and their creditors may suffer irreparable harm.

52.    I can attest that the Canadian Proceeding is pending in Canada and that Canada is the center of each of the Debtors' and their corporate family's main interests. As set forth above, (a) all corporate-level decision-making and corporate administrative functions affecting the Debtors are centralized in Sault Ste. Marie, (b) the Debtors' entire management team is based in

Sault Ste. Marie, and (c) primarily all of the Debtors' business operations are undertaken, and all of the Debtors' producing assets, are located, entirely in Canada.

53.     Finally, as described in the Memorandum of Law and the Recognition and Relief Motion, and as discussed with counsel, I understand and believe that recognizing the Canadian Proceeding as a foreign main proceeding and granting the relief requested therein on a final basis is consistent with the purposes of chapter 15 of the Bankruptcy Code and public policy of the United States.   Therefore, I believe that the provisional and final relief requested in the Recognition and Relief Motion is necessary and appropriate and is in the best interests of the Debtors, their creditors, and other parties in interest.

## II.     Joint Administration Motion

54.     The Foreign Representative has also filed, contemporaneously herewith, the Joint Administration Motion seeking entry of an order directing joint administration of these chapter 15 cases for procedural purposes only, and providing that parties in interest shall use a consolidated caption to indicate that any pleading filed relates to the jointly administered chapter 15 cases.

55.     I believe that joint administration of these chapter 15 cases is warranted because the Debtors' financial affairs and business operations are closely related and because it will ease the administrative burden of these cases on the Court and interested parties.  I can confirm that the Foreign Representative anticipates that the various notices, motions, hearings, orders, and other pleadings in these cases will affect all of the Debtors.  With five (5) affiliated Debtors, each with its own case docket, I believe that the failure to jointly administer these cases would result in numerous duplicative pleadings filed for each issue and served upon separate service lists.  I also believe that such duplication of substantially identical documents would be wasteful and would unnecessarily burden the Clerk of the Court (the "Clerk").

56.     Moreover, I have been advised that joint administration will permit the Clerk to use a single docket for all of the Debtors' cases and to combine notices to creditors and other parties in interest.  I have further been advised that joint administration will protect parties in interest by ensuring that they will be apprised of the various matters before the Court.  I believe that the proposed caption set forth in the Joint Administration Motion should be approved as the modified caption for these chapter 15 cases.

57.     I believe that the rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought in the Joint Administration Motion is purely procedural and not intended to affect substantive rights.  I have been advised that each creditor and party in interest will maintain whatever rights it has against the particular Debtor against which it allegedly has a claim or right.  I have also been advised by counsel that the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration.  Finally, I have been advised that if the requested relief is granted, the Court and the Clerk will be relieved of the burden of entering duplicative orders and keeping duplicative files, and supervision of the administrative aspects of these cases by the Office of the United States Trustee for the District of Delaware will be simplified.

58.     Therefore, I believe that the relief requested in the Joint Administration Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

## III.    Consolidated Lists Motion

59.     The Foreign Representative has also filed, contemporaneously herewith, the Consolidated Lists Motion seeking the entry of an order authorizing the Foreign Representative to file a consolidated list identifying the names and addresses of the authorized foreign administrators of the Debtors, parties to litigation pending in the United States involving any of

the Debtors, and all persons and entities against whom the Debtors seek provisional relief pursuant to section 1519 of the Bankruptcy Code.

60.     I can confirm that the Debtors presently maintain various computerized lists that contain the data required to comply with the requirements of Bankruptcy Rule 1007(a)(4). I, along with the Foreign Representative, believe that the information, as maintained in the Debtors' computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the information required by Bankruptcy Rule 1007(a)(4). I, along with the Foreign Representative, submit that the filing of a consolidated Bankruptcy Rule 1007(a)(4) list serves the interests of efficiency and will conserve the resources of all parties in interest, including the Court.

61.     Therefore, I believe that the relief requested in the Consolidated Lists Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

**IV.     Notice Procedures Motion**

62.     The Foreign Representative has also filed the Notice Procedures Motion seeking the entry of an order approving (a) the form of notice (the "Recognition Hearing Notice") of (i) the chapter 15 petitions, (ii) the entry of the Provisional Order, (iii) the deadline to object to the proposed Final Order, and (iii) the Recognition Hearing; (b) the manner of service of the Recognition Hearing Notice; and (c) the manner of service on the Master Service List of any pleadings filed in these chapter 15 cases.

63.     I can attest that the Debtors have hundreds of creditors, potential creditors, and other parties in interest, all of whom need to be provided with, among other things, notice of the Provisional Order, the proposed Final Order, the Recognition Objection Deadline, and the Recognition Hearing. Under the facts and circumstances of the Debtors' chapter 15 cases, I

submit that service of the Recognition Hearing Notice in the manner proposed herein will provide the Notice Parties with due and sufficient notice of the relief requested in the Recognition and Relief Motion and associated objection deadline and hearing dates.

64.     Furthermore, I believe that the Recognition Hearing Notice provides multiple efficient ways for any party receiving such notice to obtain copies of pleadings filed in these chapter 15 cases, as it provides an email address and phone number that can be used to obtain critical documents including the Recognition Motion, the Provisional Order, the Preliminary CBCA Order, and the proposed Final Order.  Additionally, I believe that service by the Foreign Representative of all pleadings that it files in these cases by United States or Canadian mail, first class postage prepaid, on the Master Service List is an efficient and effective way to provide notice to such key parties in these cases and the Canadian Proceeding.  At the same time, I believe that it will not overburden the Foreign Representative with the significant costs associated with copying and mailing all the various documents filed in these cases to the entire matrix of putative creditors and other parties.

65.     Therefore, I believe that the relief requested in the Notice Procedures Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

## Conclusion

66.     Based on the foregoing, I believe that the relief being requested at the outset of these chapter 15 cases is well-justified, necessary under the circumstances, in the best interests of the Debtors and their creditors, and should be granted.

67.     I certify pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge,

information, and belief, and that the copy of the Preliminary CBCA Order attached hereto as

**Exhibit A** is a true and correct copy of the same as entered by the Canadian Court.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct to the best of my information and belief.

Dated: July 16 2014



By:      */s/ J. Robert Sandoval*
Name:    J. Robert Sandoval
Title:    General Counsel of
           Essar Steel Algoma Inc.

**<u>Exhibit A</u>**

**Preliminary CBCA Order**

Court File No. 14-CV-10629 00CL

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE REGIONAL | ) | WEDNESDAY, THE 16TH |
| | ) | |
| SENIOR JUSTICE MORAWETZ | ) | DAY OF JULY, 2014 |

**IN THE MATTER OF AN APPLICATION UNDER SECTION 192 OF THE *CANADA BUSINESS CORPORATIONS ACT*, R.S.C. 1985, c. C-44, AS AMENDED**

**AND IN THE MATTER OF RULES 14.05(2) AND 14.05(3) OF THE *RULES OF CIVIL PROCEDURE***

**AND IN THE MATTER OF A PROPOSED ARRANGEMENT OF ESSAR STEEL CANADA INC., ESSAR STEEL ALGOMA INC., ALGOMA HOLDINGS B.V., CANNELTON IRON ORE COMPANY AND ESSAR STEEL ALGOMA INC. USA**

Applicants

### PRELIMINARY ORDER

**THIS MOTION** made by Essar Steel Canada Inc. ("**Essar Canada**"), Essar Steel Algoma Inc. ("**Algoma**"), Algoma Holdings B.V. ("**Holdings**"), Cannelton Iron Ore Company ("**Cannelton**") and Essar Steel Algoma Inc. USA ("**Essar USA**" and, together with Essar Canada, Algoma, Holdings and Cannelton, the "**Applicants**"), for an interim order in connection with an arrangement pursuant to section 192 of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, as amended (the "**CBCA**"), including a stay of proceedings, was heard this day at 330 University Avenue, Toronto, Ontario.

- 2 -

**ON READING** the Notice of Application issued on July 16, 2014, the Notice of Motion, and the affidavit of Rajat Marwah sworn July 16, 2014 and the exhibits attached thereto, including a proposed transactional term sheet (the "**Term Sheet**");

**ON HEARING** submissions of counsel for the Applicants, counsel to the *ad hoc* committee of Unsecured Noteholders (as defined below), counsel to Deutsche Bank (as defined below), counsel to an *ad hoc* committee of Secured Noteholders (as defined below), and on being advised that the Director appointed under the CBCA (the "**CBCA Director**") has determined that it does not have standing to review or take a position on the within Application as there is no arrangement to be reviewed at this time;

**ON HEARING** that the Applicants intend to put forth a plan of arrangement under section 192(4) of the CBCA (the "**Arrangement**") to this Honourable Court on or before August 15, 2014 and that, during the interim period, if any proceedings are taken to enforce security or otherwise interfere with the Applicants' ordinary business operations, the Applicants' ability to present and effect the Arrangement may be jeopardized:

**COMEBACK MOTION**

1.      **THIS COURT ORDERS** that the Applicants are authorized to apply to this Honourable Court on or before August 15, 2014 for an interim order permitting the Applicants to call, hold and conduct a special meeting (the "**Noteholder Meeting**") of the holders of the $9^{7/8}\%$ senior unsecured notes (the "**Unsecured Notes**" and the holders, the "**Unsecured Noteholders**") issued by Algoma pursuant to an indenture dated June 20, 2007, as supplemented to consider the Arrangement and related relief.

**STAY OF PROCEEDINGS**

2.     **THIS COURT ORDERS** that from and including the date of this Preliminary Order until and including August 15, 2014 (the "**Stay Period**"), no person, including without limitation: (a) the lenders under the credit agreement (the "**ABL Credit Agreement**" and the credit facility created thereunder, the "**ABL Facility**") among Algoma, Holdings, Deutsche Bank Trust Company Americas, as administrative agent and as collateral agent ("**Deutsche Bank**"), and the lenders party thereto from time to time (the "**ABL Lenders**"); (b) the lenders under the credit agreement (the "**Avenue Credit Agreement**") dated as of December 6, 2013, as amended, among Algoma, Holdings, Avenue Capital Management II, L.P., as documentation agent ("**Avenue**"), and the lenders party thereto from time to time; (c) the holders of the 9.375% senior secured notes (the "**Secured Noteholders**") issued by Algoma pursuant to an indenture dated as of December 14, 2009, as supplemented (the "**Secured Notes Indenture**"); (d) the Unsecured Noteholders; (e) Avenue Special Opportunities Fund I, L.P., ("the "**Subordinated Secured Lender**") as assignee of the loan agreement dated as of May 6, 2013, as amended, between Algoma and Essar Steel Limited; or (f) any administrative agent, collateral agent, indenture trustee or similar person, shall have any right to terminate, accelerate, amend or declare in default or take any other enforcement steps under any contract or other agreement to which any of the Applicants is a party, ~~whether as borrower or guarantor~~, due to: *including any contract or agreement to which any of the Applicants are borrower or guarantor*

(a)     any of the Applicants having made an application to this Honourable Court pursuant to section 192 of the CBCA;

(b)     any of the Applicants being a party to this proceeding or being a party to the Arrangement;

- 4 -

(c)     any default or cross-default resulting from the failure to make the interest payment under the Unsecured Notes due on June 15, 2014 and the expiry of the related grace period;

(d)     any default or cross-default resulting from the issuance by Algoma of financial statements containing a going-concern statement; or

(e)     any of the Applicants taking any step contemplated by or related to the Arrangement,

without further order of this Honourable Court.

3.     **THIS COURT ORDERS** that, subject to further order of this Court, during these proceedings, the Applicants shall:

(a)     Pay the actual, reasonable and documented fees and expenses of (i) White & Case LLP and Osler, Hoskin & Harcourt LLP, each in connection with serving as legal counsel to Deutsche Bank, and (ii) Pillsbury Winthrop Shaw Pittman LLP in connection with serving as legal counsel to Wilmington Trust Company, as trustee for the Secured Notes Indenture (the "**Secured Note Trustee**"), in each case of (i) and (ii) in connection with the within Application and any proceedings taken under chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532;

(b)     unless otherwise agreed, comply with the "Borrowing Base" (as such term is defined in the ABL Credit Agreement);

(c)     deliver the Budget (as such term is defined in the Term Sheet) to Deutsche Bank, the Secured Note Trustee and to any ABL lender who has executed a non-disclosure agreement satisfactory to the Applicants and Lazard Freres & Co. LLC, in accordance with the Restructuring Support Agreement if and when executed; and

(d)     pay any unpaid interest accrued and owing under the ABL Facility, the Secured Notes Indenture, and the Avenue Credit Agreement as and when due under the applicable credit documents; provided that such interest shall accrue and be owed at the non-default rate set forth in such credit documents.

4.    **THIS COURT ORDERS** that, subject to further order of this Honourable Court, the only persons entitled to notice of and to appear and be heard at subsequent motions within these proceedings shall be:

(a)     the Applicants and their counsel;

(b)     counsel to each of the *ad hoc* committee of Unsecured Noteholders, Deutsche Bank, Avenue, the Secured Note Trustee, the *ad hoc* committee of Secured Noteholders, and the Subordinated Secured Lender;

(c)     the CBCA Director;

(d)     the directors of Essar Canada and Algoma; and

(e)     any person who has filed a Notice of Appearance herein in accordance with the Notice of Application, this Preliminary Order and the *Rules of Civil Procedure*.

5.     **THIS COURT ORDERS** that any Notice of Appearance served in these proceedings shall be served on the solicitors for the Applicants and the *ad hoc* committee of Unsecured Noteholders as soon as reasonably practicable at the following address, respectively:

> **Stikeman Elliott LLP**
> Barristers & Solicitors
> 5300 Commerce Court West
> 199 Bay Street
> Toronto, Canada  M5L 1B9
>
> Attention: Ashley Taylor and John Ciardullo
>
> **Goodmans LLP**
> Bay Adelaide Centre
> 333 Bay Street, Suite 3400
> Toronto, ON  M5H 2S7
>
> Attention: Robert Chadwick and Joe Latham

6.     **THIS COURT ORDERS** that any materials to be served and filed by the Applicants in support of any subsequent motion in these proceedings may be served and filed three business days prior to the motion.

## FOREIGN PROCEEDINGS

7.     **THIS COURT ORDERS** that Algoma is hereby authorized and empowered, but not required, to act as the foreign representative (the "**Foreign Representative**") in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside of Canada.

8.     **THIS COURT ORDERS** that the Foreign Representative is hereby authorized to apply for foreign recognition of these proceedings, as necessary, in any jurisdiction outside of Canada, including as ~~"Foreign Main Proceedings"~~ in the United States pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

**E-SERVICE PROTOCOL**

9.      **THIS COURT ORDERS** that the E-Service Protocol of the Commercial List (the "**Protocol**") is approved and adopted by reference herein and, in this proceeding, the service of documents made in accordance with the Protocol (which can be found on the Commercial List website at http://www.ontariocourts.ca/scj/practice/practice-directions/toronto/e-service-protocol/) shall be valid and effective service. Subject to Rule 17.05 this Order shall constitute an order for substituted service pursuant to Rule 16.04 of the Rules of Civil Procedure. Subject to Rule 3.01(d) of the Rules of Civil Procedure and paragraph 21 of the Protocol, service of documents in accordance with the Protocol will be effective on transmission. This Court further orders that a Case Website shall be established in accordance with the Protocol with the following URL '<www.donlinrecano.com/essarsteelcanada>'.

10.     **THIS COURT ORDERS** that if the service or distribution of documents in accordance with the Protocol is not practicable, the Applicants are at liberty to serve or distribute this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or facsimile transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the Applicants and that any such service or distribution by courier, personal delivery or facsimile transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

**AID AND RECOGNITION**

11.    **THIS COURT** seeks and requests the aid and recognition of any court or any judicial, regulatory or administrative body in any province of Canada and any judicial, regulatory or administrative tribunal or other court constituted pursuant to the Parliament of Canada or the legislature of any province and any court or any judicial, regulatory or administrative body of the United States or other country to act in aid of and to assist this Honourable Court in carrying out the terms of this Preliminary Order.

ENTERED AT / INSCRIT À TORONTO
ON / BK / PULICIU
LE / DANS LE REGISTRE NO.:

JUL 1 6 2014

IN THE MATTER OF AN APPLICATION UNDER 192 OF THE *CANADA BUSINESS CORPORATIONS ACT*, R.S.C. 1985, c. C-44, AS AMENDED

AND IN THE MATTER OF RULES 14.05(2) and 14.05(3) OF THE *RULES OF CIVIL PROCEDURE*

AND IN THE MATTER OF A PROPOSED ARRANGEMENT OF ESSAR STEEL CANADA INC., ESSAR STEEL ALGOMA INC., ALGOMA HOLDINGS B.V., CANNELTON IRON ORE COMPANY AND ESSAR STEEL ALGOMA INC. USA

Court File No. 14.CV10629.00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**
Proceeding Commenced at Toronto

**APPLICATION RECORD OF THE APPLICANTS**

**STIKEMAN ELLIOTT LLP**
Barristers & Solicitors
5300 Commerce Court West
199 Bay Street
Toronto, Canada  M5L 1B9

**Ashley John Taylor** LSUC#: 39932E
Tel: (416) 869-5236
E-mail: ataylor@stikeman.com

**Kathryn Esaw** LSUC#: 58264F
Tel:  (416) 869-5230
E-mail: kesaw@stikeman.com

**Yannick Katirai** LSUC#: 62234K
Tel:  (416) 869-5556
E-mail: ykatirai@stikeman.com
Fax:  (416) 947-0866

Lawyers for the Applicants

*[handwritten endorsement notes]*

6269014 v2

Court File No.: 14-CV-10629-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF AN APPLICATION UNDER SECTION 192 OF THE *CANADA BUSINESS CORPORATIONS ACT*, R.S.C. 1985, c. C-44, AS AMENDED

AND IN THE MATTER OF RULES 14.05(2) AND 14.05(3) OF THE *RULES OF CIVIL PROCEDURE*

AND IN THE MATTER OF A PROPOSED ARRANGEMENT OF ESSAR STEEL CANADA INC., ESSAR STEEL ALGOMA INC., ALGOMA HOLDINGS B.V., CANNELTON IRON ORE COMPANY AND ESSAR STEEL ALGOMA INC. USA

**ENDORSEMENT**

July 16, 2014

A. J. Taylor, K. Esaw for Applicants
H. Meredith for Essar Global
M. De Lellis for Deutsche Bank Trust
L. J. Latham and R.J. Chadwick for Ad Hoc Committee of Unsecured
K. Zych and S. Zweig for Secured Noteholders

The Applicants move for a Preliminary Order.  Motion is treated as being "ex parte".  Motion granted and Preliminary Order signed in form presented, as amended.  Reasons will follow.

"Morawetz RSJ"

**Exhibit B**

**Term Sheet**

Final Version
Wednesday, July 16, 2014

---

## ESSAR STEEL ALGOMA INC.
### Summary Agreement with Ad Hoc Committee of Unsecured Noteholders[1]

---

| | |
|---|---|
| Claim Amount: | The original principal amount of the Company's 9.875% Senior Notes due 2015 plus all accrued and unpaid interest thereon (and on all due and unpaid interest) at the non-default rate through the closing of the restructuring transactions (collectively, the "Transaction") described herein (the "Claim"). |
| Cash Payment: | 32.5% of the Claim payable in cash in USD[2] at closing. |

| | | |
|---|---|---|
| Exchange Notes: | Principal Amount: | 55% of the Claim. |
| | Security: | Lien on all assets of Essar Steel Algoma Inc. and its subsidiaries (the "Company" or "Algoma"), including all assets securing the Company's new senior secured obligations payable to the Company's new, unaffiliated, third party senior secured lenders (the "New Senior Secured Debt"). Lien shall rank immediately junior to the New Senior Secured Debt, but in any event shall not rank lower than a third lien on the assets as described in the foregoing sentence. |
| | Interest Rate: | PIK or cash, at the Company's option, at 150 bps above the all-in-yield to maturity of the Company's lowest ranking New Senior Secured Debt, subject to a floor of 9.875%. |
| | Maturity: | 90 days after maturity date of the lowest ranking New Senior Secured Debt. |
| | Call Rights: | The Exchange Notes shall be callable in full, but not in part, in accordance with the following call schedule: (i) 90% of the original principal amount of the Exchange Notes plus 100% of all PIK interest, regardless if capitalized or accrued, since the closing of the Transaction, if called between the closing of the Transaction and the first anniversary |

---

[1] The term Unsecured Noteholders means holders of the Company's 9.875% Senior Notes due 2015, and the 9.875% notes shall be referred to herein as the "Existing Notes."

[2] All amounts referenced herein shall be in U.S. dollars.

1

Final Version
Wednesday, July 16, 2014

of the issuance date of the Exchange Notes, (ii) 100% of the amount then outstanding of the Exchange Notes (including all PIK interest paid to such date) plus 100% of all PIK interest accrued and unpaid from the first anniversary through the second anniversary of the issuance date of the Exchange Notes, and (iii) thereafter, 110% of the amount then outstanding of the Exchange Notes (including all PIK interest paid to such date) plus 100% of all accrued and unpaid PIK interest.  For the avoidance of doubt, PIK interest shall be payable and compound quarterly.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Company may, at its option, pay cash equal to the call right in clause (i) above at closing in lieu of issuing the Exchange Notes.

Rating Requirement:  The Company shall use commercially reasonable efforts to have the Exchange Notes rated by at least one rating agency by the closing of the Transaction contemplated herein; provided that such rating shall be obtained not later than thirty (30) days after the closing of such Transaction.

Intercreditor Agreement:  Standard and customary intercreditor agreement shall be entered into subject to the Ad Hoc Committee's reasonable consent, taking into account the nature and lien priority position of the Exchange Notes described in this term sheet.

Exchange Notes Covenants:  Terms shall not be more restrictive than the terms for lowest ranking New Senior Secured Debt.

Ad Hoc Committee New Second Lien Financing Participation Fee:  For the participation of any individual member of the Ad Hoc Committee of Unsecured Noteholders (the "Ad Hoc Committee") in any new second lien financing (the "Participation"), such individual member will receive a fee payable upon the funding of the Participation, if any.  The fees payable upon funding shall be the greater of (i) 2% of the Participation and (ii) 75% of the fees that the investment banks would otherwise earn if they arranged the same amount as the Participation, payable by the Company at the closing of any such new second lien financing.

Final Version
Wednesday, July 16, 2014

EGFL Shareholder Loan:
The EGFL shareholder loan claims consisting of an approximately $30 million loan from EGFL to the Company, plus accrued and unpaid interest thereon, shall remain outstanding as of the closing of the Transaction or, at EGFL's sole option, converted to equity in the Company, subject to such modifications as the Ad Hoc Committee and EGFL shall mutually agree upon, which shall include the following modifications: (i) be subordinated to the Exchange Notes in all respects, (ii) have a maturity date that is at least 90 days beyond the maturity date of the Exchange Notes; (iii) only receive PIK interest payments prior to the maturity of the Exchange Notes; and (iv) otherwise not permit any cash payments to be made to the holder(s) thereof on account of such EGFL shareholder loan prior to the payment in full of the Exchange Notes (including all accrued PIK interest and any applicable call premium).

EGFL Commitment:
EGFL shall execute and deliver to the Company a commitment letter (the "EGFL Commitment") in form and substance satisfactory to the Company and the Ad Hoc Committee, pursuant to which EGFL shall commit to acquire for cash (the "Investment"), directly or through one or more non-debtor subsidiaries, newly-issued equity securities (the Investment may be made, as equity, or at EGFL's option, as a Permitted Shareholder Loan (pursuant to, and as such term is defined under the indenture for the Existing Notes) that is junior and subordinated to the Existing Notes, provided that any such Permitted Shareholder Loan shall convert to equity at the closing of the Transaction) (collectively, "Securities") of Algoma, the proceeds of which shall be sufficient to fund and support the Transaction as set forth herein.  The EGFL commitment shall, at a minimum, amount to $250 million (USD) (the "EGFL Minimum Total Commitment") and, be subject to a maximum total commitment of $300 million (USD) (the "EGFL Maximum Total Commitment"), as described in the EGFL Commitment letter and subject to the Permitted Inventory Financing (as defined herein).  The Investment shall consist of the purchase by EGFL directly or through one or more non-debtor affiliates of (a) Securities in an amount not to exceed an aggregate amount of $100 million in cash (the "Pre-Closing Liquidity Commitment"), of which $25 million shall be funded not later than 5 business days after executing the RSA, with the remaining amounts to be agreed based upon a Budget acceptable to the Ad Hoc Committee, and any amounts paid indirectly by EGFL or its affiliates to satisfy any guarantee by EGFL or its affiliates, directly or indirectly, of accounts receivable owed to the Company shall reduce dollar-for-dollar the Pre-Closing Liquidity Commitment; provided that the funds paid to satisfy such guarantee must be free of restrictions on use and constitute

unrestricted cash, subject to the existing Borrowing Base, as defined and set forth in the Credit Agreement, dated September 20, 2012[3] and (b) a cash amount sufficient when combined with the net proceeds of the New Senior Secured Debt and any unrestricted balance sheet cash immediately prior close to: (i) repay the existing secured debt in full in cash, (ii) pay the Cash Payment, (iii) pay in cash all fees and expenses of the Transaction due at or prior to closing and (iv) meet the Minimum Liquidity Threshold (described below) (the "Cash Closing Commitment"; together with the Pre-Closing Liquidity Commitment, the "Commitment") to be funded on the date of the closing of the Transaction, provided, further, however, that the Commitment shall not be less than the EGFL Minimum Total Commitment and shall not exceed the EGFL Maximum Total Commitment, subject to the Permitted Inventory Financing. For the avoidance of doubt and notwithstanding anything herein to the contrary, if the Company is able to finance the purchase of raw materials or inventory from an unaffiliated third party through consignment financing on an arm's-length basis on or before the closing date of the Transaction (the "Permitted Inventory Financing"), then EGFL shall fund amounts of the Commitment into escrow up to the amount of such Permitted Inventory Financing (the "Commitment Escrow"), provided that such Permitted Inventory Financing shall not exceed $50 million. Upon closing of the Transaction, EGFL shall receive the funds in the Commitment Escrow, such that any such Permitted Inventory Financing shall reduce the EGFL Commitment (including the EGFL Minimum Commitment and the EGFL Maximum Commitment, respectively) by the amount of such Permitted Inventory Financing, up to maximum Commitment reduction of $50 million; provided that such Permitted Inventory Financing shall not reduce the Pre-Closing Liquidity Commitment. If the Transaction does not close, for any reason, the Company shall receive the funds in the Commitment Escrow.

The Investment shall at all times be junior and subordinated in all respects to the Existing Notes. If any amount of the Investment is funded as a Permitted Shareholder Loan, then EGFL shall also be required to execute an intercreditor agreement that will require EGFL to (i) vote the Investment in favor of or support any transaction or plan supported by the Ad Hoc Committee and (ii) convert such Permitted Shareholder Loan into equity upon the closing of the Transaction.

---

[3]   In addition, such amounts cannot be swept by Deutsche Bank or the Company's existing senior secured lenders.

Final Version
Wednesday, July 16, 2014

Prior to the execution of the RSA, the Company shall prepare and deliver to EGFL a cash flow forecast from such date through November 15, 2014 (as such forecast may be modified from time to time with the consent of EGFL, a "Budget"), which Budget and any modifications thereto shall be in form and substance reasonably acceptable to EGFL, the Company and the Ad Hoc Committee.  The Company may only expend funds consisting of the Pre-Closing Liquidity Commitment in accordance with the Budget, subject to a permitted variance of 20%.  The Company shall share the Budget with the advisors to the Ad Hoc Committee and counsel to the ABL administrative agent, and the Budget shall remain confidential. Each funding of the Pre-Closing Liquidity Commitment after the initial amount funding within 5 business days of signing the RSA (each subsequent funding, a "Liquidity Funding") shall be made not later than five business days after the delivery by the Company to EGFL of a written notice (each, a "Funding Notice") of the proposed funding amount, which shall be not less than $500,000 per Funding Notice, shall occur on a monthly basis on or about the 15th of each calendar month beginning in August 2014, and shall not be greater than the Budget for any such month plus the permitted variance for which the Funding Notice has been required, signed by an authorized officer of the Company.  The Funding Notice shall specify the proposed use of the proceeds of such Liquidity Funding which shall be consistent with the Budget.  The Commitment shall be evidenced by documentation executed, and in a form to be agreed, by EGFL, the Ad Hoc Committee and Algoma (the "Definitive Commitment Documentation").  To the extent of any inconsistency between this term sheet and the Definitive Commitment Documentation, the Definitive Commitment Documentation shall control.  The Commitment shall be delivered to the Ad Hoc Committee by no later than July 17, 2014.  Algoma shall pay from time to time upon demand (but not more frequently than once per calendar month) by EGFL the reasonable and documented legal, financial, and other advisor fees and expenses incurred by EGFL in connection with the Commitment Letter or the Transaction from the proceeds of Commitment, which fees and expenses shall be provided for in the Budget.  Notwithstanding the foregoing, if on any day prior to the closing of the Transaction the Company has an unrestricted cash balance of less than $10 million, then the Company shall have five (5) business days to return its unrestricted cash balance to a minimum of $10 million.  Notwithstanding anything to the contrary herein, EGFL shall be obligated to fund $10 million of the Pre-Closing Liquidity Commitment to the extent requested by the Company to comply with the cash balance test in the foregoing sentence.

In addition, at its sole option after consultation with the Company, EGFL may cause one or more of its indirect subsidiaries to contribute all or part of their equity interests in New Trinity Coal Inc. to Algoma to support the Transaction.

EGFL shall determine, in its sole discretion after consultation with the Company, whether the Company's existing equity securities shall be cancelled as of the date of the closing of the Transaction or shall remain in place.

|  |  |
|---|---|
| The Refinancing: | To be arranged by Algoma.  The Transaction outlined herein shall be conditioned on a successful refinancing through the incurrence of New Senior Secured Debt of the following existing obligations (outstanding principal amounts are approximate): |

- $344 million ABL facility
- $25 million secured term loan
- $400 million senior secured notes
- $30 million transferred third party loan

If EGFL causes one or more of its direct or indirect subsidiaries to contribute all or part of their equity interests in New Trinity Coal Inc. to assist the refinancing, it will provide reasonable protections regarding future investments in New Trinity Coal Inc. (to be based on permitted investment baskets).

Unless the Ad Hoc Committee otherwise consents, the weighted average interest rate of the new secured indebtedness that will be senior to the Exchange Notes shall be no higher than the weighted average interest rate to be disclosed to the advisors to the Ad Hoc Committee no later than July 17, 2014.

The Company shall have minimum liquidity of $75 million (USD) in aggregate unrestricted revolver availability (net of any outstanding letters of credit or other unfunded utilization) and unrestricted cash  on hand as of the closing date of the Transaction after giving effect to the Transaction, provided, however that (i) if the Transaction closes in October 2014 then the Company shall have minimum liquidity of $60 million (USD) and (ii) if the Transaction closes in November 2014 then the Company shall have minimum liquidity of $50 million (USD), of which, at least $25 million (USD) must be in the form of unrestricted cash (the "Minimum Liquidity Threshold").

The total gross amount of funded debt of the Company that will be senior to the Exchange Notes shall not exceed $800 million (USD) as of the closing of the Transaction, which amount shall be

reduced dollar-for-dollar by the proceeds of any asset sales by the Company; provided that the Company shall be able to increase the gross amount of funded debt that will be senior to the Exchange Notes above $800 million to an amount not to exceed $825 million in exchange for the payment of an additional cash fee of $4 million to holders of the Existing Notes (to be shared pro rata among such holders based on their aggregate holdings) to be paid upon the closing of the Transaction.

| | |
|---|---|
| Process: | The Company, EGFL and the Ad Hoc Committee will sign a Restructuring Support Agreement (the "RSA") on or before July 17, 2014, which will, among other things, subject to the terms and conditions thereof, (i) obligate the Company to pursue and effectuate the Transaction described herein, (ii) obligate EGFL to pursue and effectuate its funding and other commitments described herein and to take actions consistent with the Transaction described herein, and (iii) obligate the members of the Ad Hoc Committee to vote their Existing Notes in favor of the Transaction outlined herein (subject to the exclusion of certain Existing Notes in an amount not to exceed approximately $10 million in principal amount of the Existing Notes). |

Commence a CBCA Process in Toronto, Ontario on or around July 16, 2014, along with a Chapter 15 Proceeding in the United States after entry of the interim order in the CBCA Process.

Obtain Stay Order in Canada via the preliminary CBCA order.

Obtain Stay Order in United States immediately upon filing for Chapter 15.

The Company is targeting to close the Transaction by September 30, 2014; provided, however that the closing shall occur no later than November 15, 2014, subject to further extension by mutual agreement of the Company, EGFL and the Ad Hoc Committee.

The Company shall issue a press release on or after, July 16, 2014 announcing that an agreement in principle has been reached with the Ad Hoc Committee, without disclosing the identities of the Ad Hoc Committee's constituent members.  The press release shall be acceptable to the Ad Hoc Committee.

| | |
|---|---|
| Governance: | EGFL shall have the right to designate the non-independent directors of the Board of the Reorganized Company at all times. As of the closing and at all times thereafter for so long as the Exchange Notes are outstanding no less than 40% of the Board of Directors of the Reorganized Company shall be independent, |

7

provided that each such initial independent director(s) shall be subject to the consent of the Ad Hoc Committee, such consent not to be unreasonably withheld.  The initial independent directors shall serve for an initial term of not less than three years.  The definition of independence shall comply with the meaning set forth in the Securities and Exchange Commission guidelines for independent directors of reporting companies.

The Company shall enter into new agreements with affiliates prior to the closing of the Transaction contemplated herein only if such Transaction are on an arms'-length basis and approved by the CBCA court or an independent financial advisor to the Company that is reasonably acceptable to the Ad Hoc Committee. The Company shall not honor any "trade advance" obligations to its affiliates prior to the closing of the Transaction contemplated herein.

| | |
|---|---|
| Advisor Fees: | As provided for in the RSA, the Company shall pay the reasonable and documented fees and expenses of the Ad Hoc Committee's advisors incurred from the signing of the Ad Hoc Committee's advisor's engagement letters through the date of the signing of the RSA.  The Company shall timely pay the reasonable and documented fees and expenses of the Ad Hoc Committee's advisors incurred from the signing of the RSA through the closing of the Transaction pursuant to the terms of the engagement letters executed between such advisors and the Company.  Upon the closing of the Transaction described herein, the Company shall pay all remaining outstanding reasonable and documented fees and expenses of the Ad Hoc Committee's legal and financial advisors (including those fees and expenses incurred prior to May 30, 2014). |
| Definitive Documentation: | The loan documents for the Company's New Senior Secured Debt and all other definitive Transaction documents, shall be reasonably satisfactory to a majority of the Initial Consenting Noteholders (as defined in the RSA) in all material respects. |

## **Exhibit C**

**Board Resolutions**

## RESOLUTIONS OF THE BOARD OF DIRECTORS
## OF ESSAR STEEL ALGOMA INC. ON BEHALF OF ITSELF AND
## OF CERTAIN OF ITS DIRECT AND INDIRECT SUBSIDIARIES

At a meeting on July 15, 2014, of the board of directors (the "**Authorizing Body**") of Essar Steel Algoma Inc. (the "**Company**"), the Company's Authorizing Body took the following actions and adopted the following resolutions:

**WHEREAS**, the Authorizing Body reviewed and considered presentations by each of the Company's management team and the financial and legal advisors of the Company regarding a proposed financial restructuring (the "**Restructuring**") as described in the draft restructuring support agreement, in form and substance generally similar to that agreement attached hereto as **Exhibit A** (the "**Restructuring Support Agreement**"), by and among (i)the Company; (ii) Essar Global Fund Ltd. ("**EGFL**"), and (iii) KKR Asset Management LLC, Loomis, Sayles & Co. L.P., and Sankaty Advisors, LLC (the "**Consenting Noteholders**") the terms of which are reflected in the term sheet ("**Term Sheet**") attached hereto as **Exhibit B**;

**WHEREAS,** the following documents have been made available to the Authorizing Body prior to the meeting: (i) a draft of the Restructuring Support Agreement and the Term Sheet, (ii) a presentation dated July 15, 2014 prepared by Blackstone Advisory Group, Kirkland & Ellis LLP and Stikeman Elliott LLP, (iii) a draft resolution of the Board of Directors; (iv) a fairness opinion by Alvarez & Marsal Valuation Services, LLC ("**A&MVS**") and (v) a draft press release of the Company announcing the agreement reached with the Consenting Noteholders and the commencement of the court proceedings (the "**Press Release**");

**WHEREAS,** the Authorizing Body has had the opportunity to consult with the Company's management team and the financial and legal advisors to the Company and fully consider the proposed Restructuring;

**WHEREAS,** A&MVS has provided an opinion to the Board of Directors to the effect that from a financial point of view: (i) the Restructuring is fair to the Company; and (ii) the Unsecured Noteholders would be in a better position under the Restructuring than if the Company were liquidated;

**WHEREAS,** Kishore Mirchandani of the Authorizing Body, in his capacity as an independent director (the "**Independent Director**") has had the opportunity to consult with the Company's management team and the financial and legal advisors to the Company and fully consider the proposed Restructuring;

**WHEREAS**, the Authorizing Body has determined that, in the judgment of the Authorizing Body, it is desirable and in the best interests of the Company, its creditors, and other stakeholders, to implement the Restructuring substantially in the form of the RSA and Term Sheet proposed to be entered into by the Company, EGFL and the Consenting Noteholders;

**WHEREAS**, the Independent Director has determined that, in the judgment of the Independent Director, it is desirable and in the best interests of the Company, its creditors, and other stakeholders, to implement the Restructuring substantially in the form of the RSA

and Term Sheet proposed to be entered into by the Company, EGFL and the Consenting Noteholders;

**WHEREAS,** the Authorizing Body intends that the Restructuring will be implemented through: (a) an arrangement under Section 192 of the Canada Business Corporations Act (the "**Arrangement**"); (b) a proceeding (the "**Canadian Proceeding**") in the Ontario Superior Court of Justice, Commercial List; and (c) a recognition proceeding (the "**Recognition Proceeding**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to recognize the Canadian Proceeding as a foreign main proceeding under chapter 15 of title 11 of the United States Code (the "**Recognition Order**");

**AND WHEREAS** in furtherance of the Restructuring, the Authorizing Body wishes to enter into the Restructuring Support Agreement;


**NOW THEREFORE BE IT RESOLVED THAT:**

**The Restructuring**

1.    The unanimous determination of the Authorizing Body is that: (a) the Restructuring is in the best interests of the Company, taking into account the interests of the Company's stakeholders; and (b) the recommendation of the Authorizing Body to the Unsecured Noteholders is that they vote in favour of the resolution authorizing and approving the Arrangement.

**The Restructuring Support Agreement**

2.    The entering into by the Company of the Restructuring Support Agreement, substantially in the form presented to the Authorizing Body, is hereby authorized and approved and any one officer or director of the Company is hereby authorized to negotiate, execute and deliver the Restructuring Support Agreement for and on behalf of the Company, together with such changes, additions and deletions thereto as any one officer or director of the Company may consider advisable, and the execution of the Restructuring Support Agreement by any one officer or director shall be conclusive evidence that the Restructuring Support Agreement is in the form authorized by these resolutions and the Company be and it is authorized to perform its obligations under the Restructuring Support Agreement.

**CBCA/Chapter 15 Filings**

3.    The appropriate notices, applications and filings with the Canadian Court relating to the Canadian Proceeding and with the Bankruptcy Court relating to the Recognition Proceeding are hereby authorized and approved, and any one officer or director of the Company is hereby authorized to take such other action and execute such other documents as may be necessary or desirable to apply for and obtain the approval of Canadian Court required to give effect to the Arrangement and to obtain the Recognition Order from the Bankruptcy Court.

4.    Essar Steel Algoma Inc. is hereby authorized and empowered to act as the foreign representative (the "**Foreign Representative**") in respect of the Canadian Proceeding

for the purpose of having the Canadian Proceeding recognized by the Bankruptcy Court.

**Press Release**

5.    The Press Release, substantially in the form presented to the Authorizing Body, is hereby authorized and approved with such additions, deletions and changes as any one officer or director may approve.

**Professionals**

6.    Kirkland & Ellis LLP, Stikeman & Elliott LLP, and Blackstone Advisory Group are hereby authorized to take any and all actions necessary to advance the Company's rights and obligations and facilitate the commencement of the court proceedings, including filing any pleadings and petitions for relief.

**General**

7.    Any one officer or director of the Company is hereby authorized and directed to prepare, execute and deliver any and all such other certificates, undertakings, applications, agreements, documents or writings in the name and on behalf of the Company and to do and to perform or cause to be done and performed any and all such other acts and things as such officer or director may determine in his or her absolute discretion to be necessary or advisable in order to carry out the purposes and intent of the foregoing resolutions and/or to effect the Arrangement to the extent required to be performed by the Company, the execution and delivery of any and all such other certificates, undertakings, applications, agreements, documents or writings and the performance or causing the performance of any and all such other acts and things to be conclusive evidence of such determination.